# In the United States Court of Federal Claims

No. 12-57 C

(Filed April 14, 2016)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

M.K. FERGUSON COMPANY, for the   \*
use and benefit of the secured creditors of   \*
GROUND IMPROVEMENT   \*
TECHNIQUES, INC.; PNC BANK, N.A.;   \*
FIREMAN'S FUND INSURANCE   \*   Contracts; RCFC
COMPANY; and R.N. ROBINSON &   \*   12(b)(1); RCFC 12(b)(6);
SONS, INC.,   \*   Defective Certification of
\*   Claim; *Severin* Doctrine;
*Plaintiffs*,   \*   Allowable Contract Costs.
\*
v.   \*
\*
THE UNITED STATES,   \*
\*
*Defendant*.   \*

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*   \*

    *Robert G. Barbour*, McLean, VA, for plaintiffs.  *Keith C. Phillips*, McLean, VA, of counsel.

    *Jeffrey A. Regner*, United States Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, *Steven J. Gillingham*, Assistant Director, Washington, DC, for defendant.

_____

## OPINION AND ORDER
_____

**Bush**, *Senior Judge*.

The court has before it the government's motion to dismiss brought under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC).  Defendant's motion has been fully briefed.  Oral argument was neither requested by the parties nor required by the court.  For the reasons set forth below, defendant's motion is denied.

## BACKGROUND[1]

Most of the relevant background for this dispute may be found in *Ground Improvement Techniques, Inc. v. United States*, 108 Fed. Cl. 162 (2012) (*GIT I*), *Ground Improvement Techniques, Inc. v. United States*, No. 12-57C (Fed. Cl. May 3, 2013) (*GIT II*), *Ground Improvement Techniques, Inc. v. United States*, No. 12-57C (Fed. Cl. April 30, 2014) (*GIT III*), and *Ground Improvement Techniques, Inc. v. United States*, 618 F. App'x 1020 (Fed. Cir. 2015) (*GIT IV*). Only the facts essential to the dispute currently before the court are presented here. In 1995, Ground Improvement Techniques, Inc. (GIT) became the subcontractor for MK-Ferguson Company (MK) on a United States Department of Energy project in Slick Rock, Colorado (the DOE project) for the remediation of uranium mill tailings.[2]  As a result of a contract dispute, GIT eventually won a judgment against MK in a federal court, a portion of which remains unsatisfied.  It is that unsatisfied portion of the judgment against MK that underlies the claim in plaintiffs' amended complaint.

In 2001, MK filed for bankruptcy under Chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the District of Nevada (the MK bankruptcy litigation).  The unsatisfied portion of GIT's judgment against MK, and post-judgment interest, were claims administered in MK's bankruptcy.  The bankruptcy court required MK to file a certified claim with DOE to attempt to satisfy GIT's claims against MK related to the DOE project.  MK did so in 2010, but the certification was contested as inadequate.

---

[1] This background information is drawn largely from the parties' filings in this case and does not constitute fact finding by the court.  The court does not reach the merits of the claim set forth in the amended complaint in this opinion; nor should the parties rely on any descriptive language in this opinion as a characterization of the nature of that claim.

[2] MK has undergone multiple corporate name changes, and will be referred to as MK even in reference to events which occurred after those name changes.

MK very recently corrected its certification of GIT's claim to comply with claim certification requirements under the Contract Disputes Act of 1978, 41 U.S.C. §§ 7101-7109 (2012) (CDA). Pls.' App. Ex. 3. The type of claim presented in this suit is sometimes referred to as a pass-through claim, where the prime contractor certifies the claim of the subcontractor and sponsors that claim under its own name. Because GIT also went through bankruptcy, any proceeds from GIT's claim will be paid to the assignees of that claim in GIT's bankruptcy, usually referred to as the "Secured Parties."[3] Those assignees are indicated in the caption of this case by the term "secured creditors" of GIT. *See* Order of October 7, 2015.

There are three basic arguments which provide the foundation for defendant's motion to dismiss presently before the court. Def.'s Mot. at 3-4. The government's first jurisdictional argument essentially contends that the pass-through claim asserted in the amended complaint was never properly certified to the contracting officer and that the defects in certification are so grave that they cannot be cured. The government's second argument, relying on RCFC 12(b)(1) and RCFC 12(b)(6) and citing *Severin v. United States*, 99 Ct. Cl. 435 (1943), contends that because MK is not liable for GIT's claim, MK cannot sponsor GIT's claim before this court. In the alternative, defendant argues that the costs presented in MK's pass-through claim are not allowable costs pursuant to MK's contract with DOE; thus, in the government's view, the claim set forth in the amended complaint fails as a matter of law.

## DISCUSSION

### I.   Standards of Review

### A.   RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other*

---

[3] The term "GIT's claim" is a shorthand reference to the pass-through claim sponsored by MK and presented to the DOE contracting officer. This opinion does not revisit the topic of the ownership of that claim, a topic which was fully explored in *GIT I-IV*.

grounds by *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). However, the plaintiff bears the burden of establishing subject matter jurisdiction. *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)). To meet this burden, the plaintiff must establish jurisdiction by a preponderance of the evidence. *Reynolds*, 846 F.2d at 748 (citations omitted).

### B. RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss brought under RCFC 12(b)(6), "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236. The court must not mistake legal conclusions presented in a complaint, however, for factual allegations which are entitled to favorable inferences. *See, e.g.*, *Papasan v. Allain*, 478 U.S. 265, 286 (1986) ("[W]e are not bound to accept as true a legal conclusion couched as a factual allegation.") (citations omitted).

The court must also determine whether a complaint meets the plausibility standard described by the United States Supreme Court, *i.e.*, whether it adequately states a claim and provides a "showing [of] any set of facts consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (*Twombly*) (citations omitted). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*Iqbal*) (quoting *Twombly*, 550 U.S. at 570). Plausibility is a context-specific inquiry. *See, e.g.*, *Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.") (citation omitted).

## II. Analysis

### A. A Defective Certification Has Been Cured

#### 1. MK's Certification of the Pass-Through Claim

As ordered by the judge in the MK bankruptcy litigation, MK certified GIT's subcontractor claim on October 22, 2010 and provided that certification, with supporting documents, to the contracting officer on the DOE project.  That certification statement contains the following language:

> Attached please find the referenced subcontractor claim and supporting documents.
> As compelled by the Order being submitted herewith and the terms of the previous Order of the Court granting relief from the [bankruptcy] stay, I certify that the claim is made consistent with the Court's Orders; and that I am duly authorized to certify the claim on behalf of the contractor.

Am. Compl. Ex. 4 at 26.  The claim amount was for $9,842,711.83.  *Id.* at 27.

There is no real dispute that an effective certification for a nine million dollar claim must include four elements prescribed by the CDA.  The contractor must certify that:

> (A) the claim is made in good faith;
> (B) the supporting data are accurate and complete to the best of the contractor's knowledge and belief;
> (C) the amount requested accurately reflects the contract adjustment for with the contractor believes the Federal Government is liable; and
> (D) the certifier is authorized to certify the claim on behalf of the contractor.

41 U.S.C. § 7103(b).  Only the last of those four elements is clearly present in the certification letter provided by MK on October 22, 2010.  Unless the court orders issued by the bankruptcy court could relieve MK of its certification burden, it is clear that the October 22, 2010 certification is not sufficient under the CDA.

The court need not decide whether such a certification under court order, or a subsequent certification under court order submitted in MK's name but not authorized by MK, could ever be sufficient to certify a CDA claim.  MK, on December 22, 2015, provided a second certification to the contracting officer

which stated, in relevant part, that:

> On behalf of URS Energy & Construction, Inc.,
> successor to Morrison Knudson Company d/b/a MK
> Ferguson Company, I hereby certify that the
> pass-through claim of Ground Improvement
> Technologies, Inc. for the judgment amount of
> $9,842,711.83, plus interest from August 16, 2006, is
> made in good faith; that the supporting data are accurate
> and complete to the best of my knowledge and belief;
> that the amount requested accurately reflects the contract
> adjustment for which the contractor believes the
> Government is liable; and that I am duly authorized to
> certify the claim on behalf of URS Energy &
> Construction, Inc.

Pls.' App. at 22.  The December 22, 2015 certification submitted by MK contains all four elements required by the CDA.

Defendant does not argue that the December 22, 2015 certification is itself defective.  In the court's view, the December 22, 2015 certification cures the defects in MK's October 22, 2010 certification.  The submission of a corrected and proper certification normally ends the court's inquiry into the certification issue because it is well-established that a defective certification can be corrected at any time before this court enters a judgment in a contractor's suit under the CDA. *See, e.g.*, 41 U.S.C. § 7103(b)(3) ("A defect in the certification of a claim does not deprive a court or an agency board of jurisdiction over the claim.  Prior to the entry of a final judgment by a court or a decision by an agency board, the court or agency board shall require a defective certification to be corrected."); *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1329 (Fed. Cir. 2010) ("[W]hile technical compliance with certification is not a jurisdictional prerequisite to litigation of a contractor's claim under the CDA, it is a requirement to the maintenance of such an action.") (citations omitted); *James M. Ellett Constr. Co. v. United States*, 93 F.3d 1537, 1546 (Fed. Cir. 1996) (noting that after late 1992 "certification of [a CDA claim is] not a jurisdictional prerequisite").

The government does not accept this interpretation of the effectiveness of the December 22, 2015 certification, however.  Defendant asserts that the October

22, 2010 certification was not a certification at all, and thus does not benefit from the rule that a defective certification can later be corrected.  *See* Def.'s Mot. at 15 ("Plaintiff[s'] claims are not merely defectively certified, they are not certified at all.").  This is a plausible but ultimately unsuccessful argument.

The government's "failure to certify" argument is constructed upon a number of contentions.  First, relying on a provision of the Federal Acquisition Regulation (FAR), 48 C.F.R. § 33.201 (2010), defendant characterizes the October 22, 2010 certification as a "failure to certify," rather than as a defective certification.  Def.'s Mot. at 15; *see also* FAR 33.201 ("Failure to certify shall not be deemed to be a defective certification.").  Second, the government suggests that jurisdiction in this court cannot lie where MK failed to certify the pass-through claim, relying principally on *Scan Tech Security, L.P. v. United States*, 46 Fed. Cl. 326 (2000).  Third, defendant argues that MK lacked the necessary intent to certify the pass-through claim's accuracy and merit, thus rendering its October 22, 2010 certification not merely defective, but incurable.  *See* Def.'s Reply at 3 ("MK's failure to certify is not susceptible to being cured, because its refusal to provide three of the four required certifications is not a mere defect.") (citing *Scan Tech*, 46 Fed. Cl. at 335).  These arguments are not persuasive, for the following reasons.[4]

### 2.    "Failure to Certify" Not Precisely Defined

---

[4]/  Although defendant frames this inquiry as a question of jurisdiction, the court believes such an approach to be questionable in light of precedent binding on this court.  *See, e.g.*, *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1356 (Fed. Cir. 2011) ("[B]ecause these allegations [in the complaint] are non-frivolous assertions of the existence of a contract under the [CDA], the [board of contract appeals] may not decline to consider them on jurisdictional grounds."); *Fisher v. United States*, 402 F.3d 1167, 1175-76 (Fed. Cir. 2005) ("Assuming that the Court of Federal Claims has taken jurisdiction over the cause as a result of the initial determination that plaintiff's cause rests on a money-mandating source, the consequence of a ruling by the court on the merits, that plaintiff's case does not fit within the scope of the source, is simply this:  plaintiff loses on the merits for failing to state a claim on which relief can be granted."); *Do-Well Mach. Shop, Inc. v. United States*, 870 F.2d 637, 639 (Fed. Cir. 1989) ("The presence of a valid defense, however, does not oust a tribunal of jurisdiction unless, of course, the defense is jurisdictional.").  Here, in light of these authorities, the court is not persuaded that an inquiry into whether a particular certification of a CDA claim was defective (and thus curable) or incurably deficient is indeed jurisdictional.  In any event, the government does not prevail on this issue under either RCFC 12(b)(1) or 12(b)(6).

Neither the regulation cited by defendant nor the CDA itself contains illuminating language which explains the difference between submitting a defective certification and "failing" to submit a certification.  Both parties cite to legislative history of the CDA which indicates that the 1992 amendment of the CDA sought to prevent "[w]asteful and esoteric litigation" over the certification of CDA claims.  H.R. Rep. 102-1006, at 28 (1992).  The bill before Congress also apparently attempted to favor technically deficient certifications ("the result of innocent mistake or inadvertence") over certifications which were "made fraudulently, in bad faith, or with reckless or grossly negligent disregard of the Contract Disputes Act or applicable regulations," *id.* at 28-29, although this particular concern is not explicitly stated in the final amendment of the statute, 41 U.S.C. § 7103(b)(3).  The court notes that the governing statute, 41 U.S.C. § 7103(b)(3), and the text of the regulation, FAR 33.201, even if these authorities were interpreted to incorporate every statement in the legislative history cited by the parties, do not, by any means, address every type of imperfect certification.  Courts and contract appeals boards have attempted to apply the statute and regulation to diverse fact patterns, but the court has searched in vain for a case on all fours with the facts of this case.

It is obvious that a complete failure to submit *any certification whatsoever* for a CDA claim seeking more than $100,000 is a "failure to certify" and this failure cannot qualify as a defective certification which may be cured.  *See, e.g.*, *Estes Express Lines v. United States*, 123 Fed. Cl. 538, 550 (2015) (dismissing a CDA claim for lack of jurisdiction in part because the contractor conceded that it had not submitted any certification of its large claim), *appeal docketed*, No. 16-1298 (Fed. Cir. Dec. 9, 2015).  Under less obvious, but understandable, circumstances the Armed Services Board of Contract Appeals has repeatedly held that a failure to sign a certification also constitutes a failure to certify a CDA claim under FAR 33.201.  *See, e.g.*, *Tokyo Co.*, ASBCA No. 59059, 14-1 BCA ¶ 35,590 (Apr. 23, 2014) ("Thus, the altogether lack of a signature on a certification is not a defect that can be cured under FAR 33.201 such that we can retain jurisdiction.") (citations omitted).  There is also a line of decisions from the contract appeals boards that assesses the contractor's knowledge of proper certification language, or weighs evidence of the contractor's intent to be bound by its certification.  *E.g.*, *Walashek Indus. & Marine, Inc.*, ASBCA No. 52166, 00-1 BCA ¶ 30,728 (Jan. 6, 2000); *Keydata Sys., Inc.*, GSBCA No. 14281-TD, 97-2 BCA ¶ 29,330 (Oct. 10, 1997); *Prod. Corp.*, ASBCA No. 49122-812, 96-1 BCA ¶ 28,053 (Nov. 6, 1995).

None of these board decisions were discussed by the parties.[5]  Because the facts underlying each of these board decisions appear to vary greatly, and because the decisions of the appeals boards are not binding on this court, the court finds little assistance in these board decisions for the analysis required in this case.

### 3.    "Failure to Certify" Cases Decided by This Court

Defendant relies principally on *Scan Tech* for the proposition that MK did not certify its claim in 2010 as required by the CDA, thus depriving this court of jurisdiction over the claim presented in plaintiffs' amended complaint.  Def.'s Mot. at 14 (citing *Scan Tech*, 46 Fed. Cl. at 334).  *Scan Tech*, however, is inapposite.  Two documents in *Scan Tech*, a "cost or pricing data" form submitted to the contracting officer and a letter sent to the contracting officer over two years later, were deemed by the court to have fallen short of the "defective certification" benchmark.  46 Fed. Cl. at 335-38.  The form was a "Contract Pricing Proposal Cover Sheet" which bears no resemblance to the letter submitted by MK on October 22, 2010.  *Id.* at 329.  The second document was a letter from a company official which enclosed some invoices which he stated were "as complete an assembly as possible."  *Id.*  Unlike MK's October 22, 2010 certification, this letter did not explicitly attempt to certify a CDA claim.  *Id.*  The court in *Scan Tech* found that neither of these documents was a "defective certification" because each reflected "a complete disregard of the CDA's certification requirement."  *Id.* at 338.

This court's interpretation of CDA certification requirements in *Scan Tech*, although persuasive, is not binding on this court.  *See, e.g.*, *W. Coast Gen. Corp. v. Dalton*, 39 F.3d 312, 315 (Fed. Cir. 1994) ("Court of Federal Claims decisions, while persuasive, do not set binding precedent for separate and distinct cases in

---

[5]/  In its reply brief, defendant, for the first time, indirectly alludes to the line of decisions from the boards of contract appeals which distinguishes between defective certifications and "failure to certify" scenarios.  *See* Def.'s Reply at 4-5 (citing *URS Energy & Constr., Inc.*, CBCA No. 2589, 12-1 BCA ¶ 35,055 (May 30, 2012)).  To the extent that the analysis in this board decision cited by the government is properly before the court, the court does not find it persuasive under the facts of this case.  As explained in the following section of this opinion, MK's pass-through claim certification was made under orders from a bankruptcy court, and this special circumstance must be considered when such a CDA certification is challenged.  The board decision cited in the government's reply brief does not consider this crucial issue, apparently because judicial orders were not at issue in that appeal.

that court.") (citations omitted).  The court in *Scan Tech* appropriately relied on the FAR, which provides the following guidance:

> *Defective certification* means a certificate which alters or otherwise deviates from the language in [FAR] 33.207(c) or which is not executed by a person authorized to bind the contractor with respect to the claim.  Failure to certify shall not be deemed to be a defective certification.

FAR 33.201.  The remainder of that court's analysis, however, applies caselaw to the facts before it in *Scan Tech*, which involved neither a bankrupt prime contractor under orders from a bankruptcy court, nor an explicit statement of certification, which is the case here.  Because the court in *Scan Tech* did not confront facts similar to the instant case, this court cannot agree with the government that *Scan Tech* compels a finding that "MK's failure to certify is not susceptible to being cured, because its refusal to provide three of the four required certifications is not a mere defect."  Def.'s Reply at 3.

The other cases cited by the government for its "failure to certify" argument are just as unavailing as *Scan Tech*.  In *CSX Transportation, Inc. v. United States*, 123 Fed. Cl. 244 (2015), the court held that the submission of a standard claim form for damage to property, often used to lodge tort claims against the federal government, could indeed constitute a claim under the CDA.  *Id.* at 251.  Because the claim exceeded the $100,000 threshold, however, certification was required under 41 U.S.C. § 7103.  *Id.* at 251-52.  The standard form's certification language did not resemble the language required for CDA certification set forth in 41 U.S.C. § 7103(b).  *Id.* at 252.  The court therefore ruled that the plaintiff's certification on the standard claim form was a failure to certify, not a defective certification.  *Id.* As in *Scan Tech*, the certification inquiry in *CSX* did not involve a bankruptcy court order or a letter whose sole purpose was to certify a subcontractor claim. For this reason, the analysis in *CSX* is distinguishable from the analysis required in this case.

Finally, defendant, in its reply brief, relies upon another decision of this court, *Sam Gray Enterprises, Inc. v. United States*, 32 Fed. Cl. 526, 530 (1995), without explaining how the holding in that case supports its "failure to certify" argument.  Def.'s Reply at 4.  The communications between the businessman and the United States Air Force in that case did not include a CDA claim or a CDA

claim certification.  *Sam Gray*, 32 Fed. Cl. at 529-30.  Instead, the businessman's letters and facsimiles presented requests for widely-varying amounts of money, and a statement that the contractor "in good faith" had to borrow "approximately Two Million Dollars" to provide housing to federal contractors in the Bahamas. *Id.*  The "coincidental" usage of the term "good faith" was held to "bear[] so little resemblance to the broadest possible reading of the [CDA] certification requirement that the court [found] that [the] plaintiff never made any attempt to certify his claim and that his allegation [was] merely an after-the-fact attempt to ameliorate his error."  *Id.* at 530.  The facts in *Sam Gray* in no way resemble the facts of this case.  The court cannot rely on the cases cited by the government to hold that MK failed to certify the pass-through claim submitted on October 22, 2010.

### 4.      Precedential Cases Discussing CDA Certification Requirements

In the instant case the inquiry into certification requires consideration of the particular facts under which the October 22, 2010 certification was made by MK, and a review of analogous cases.  Most relevant to this case, both in the court's view and as demonstrated by the parties' recitation of facts in their briefs, are the following circumstances:  (1) MK's claim is a pass-through claim; (2) MK's October 22, 2010 certification of the claim was made under orders of the bankruptcy court; and, (3) MK's certification employed language specified by the bankruptcy court.  *See* Def.'s Mot. at 9 (noting that MK's October 22, 2010 certification "utilized the language from the bankruptcy court's August 4, 2010 order").  For guidance, the court turns first to two precedential decisions of the United States Court of Appeals for the Federal Circuit which discuss the certification of pass-through claims.  The court then turns to a dispute which proceeded from a contract appeals board to the Federal Circuit, and in which a bankruptcy court's order influenced a prime contractor's certification of a pass-through claim.

A seminal case, with a long procedural history not of interest here, is *United States v. Turner Constr. Co.*, 827 F.2d 1554 (Fed. Cir. 1987).  Turner, the prime contractor, offered two certifications of a pass-through claim originating from its subcontractor Johnson, but also advised the contracting officer, as required under its master contract, as to the merits of the claim.  *Turner*, 827 F.2d at 1556-57.  One of these advisory reports was negative, suggesting that the

agency deny the claim, while a later advisory suggested that Turner could only provide factual background and no longer offered any legal advice as to whether the claim should be denied or granted. *Id.* at 1557. Although Turner's second certification conformed perfectly with CDA requirements, the government attempted to invalidate the certification because Turner had once recommended denial of the very claim it later certified. The Federal Circuit disagreed with the government's overly rigorous interpretation of the CDA's claim certification requirement.

The court's analysis of the validity of Turner's second certification is instructive:

> The government . . . argues . . . that the certification must not only be submitted in good faith but must reflect the prime contractor's own belief that the submitted claim reflects the amount owed by the government and that to allow the prime to substitute the subcontractor's belief for its own in making a certification would make a sham of the certification requirement, regardless of the merits of the submitted claim, and would render meaningless the prohibition against direct appeals by subcontractors. Under the facts of the present case, we do not find this argument persuasive.
>
> As explained by Turner in its October 10, 1980 letter . . . , its recommendation to deny the claim was beyond its expertise and was the result of an erroneous view of what was required of it under the terms of the contract. We agree that the recommendation as to the ultimate resolution of the claim was beyond its proper role. We further agree with the board in [*Turner Constr. Co. ex rel. Industrotech Constructors, Inc.*, ASBCA No. 25447, 84-1 BCA ¶ 16,996 (Nov. 25, 1983)] that the certification requirement requires not that the prime contractor believe the subcontractor's claim to be certain, but that the prime contractor believe that there is good ground for the claim. Thus, how the prime contractor itself would resolve the dispute should not be relevant to

the certification issue; the prime contractor should not, through the requirement that it certify subcontractor claims, be used as a substitute for the contracting officer or the board [of contract appeals] in the determination of the merits of the submitted claims under the CDA.

The government does not dispute that Turner's certification of August 13, 1980, simultaneously encompassed all of the statutory elements needed for certification. It was unequivocal and replaced the ineffective qualified certification submitted by Turner on May 19, 1980. To require more by allowing the contracting officer the discretion to look beyond certification language which complies with the statute would necessarily require an examination of the underlying basis and merits of the claim in order to determine the validity of the certification. Since a proper certification is a precursor to jurisdiction under the CDA, invalidating certifications as a result of such examinations would prevent the contracting officer, the board, or this court from employing the provisions of the CDA on any aspect of the claim. This is contrary to the overall goal of Congress that the CDA be used to resolve all disputes and claims arising from contracts with government agencies . . . .

*Turner*, 827 F.2d at 1561 (citation to legislative history omitted). The Federal Circuit also opined at length on the topic of pass-through claims, and the role of the sponsor of those claims:

As a result of the terms of the contract and the provisions of the CDA, Turner found itself in an unexpected, confusing, and potentially conflicting position with respect to its subcontractors and the administration of its duties toward the government under the contract. In practical effect, Turner found itself in the position of having to review and certify the data and legal theories underlying the subcontractor's claims while also

13

> providing the data and basis for the government's defense of the same claims.  We believe that Turner's actions under the facts of this case more than represent a good faith effort to balance and comply with the competing concerns confronting it.
>
> Given the nature of this court's day-to-day business, we do not find it at all surprising for there to be at least facially proper grounds factually and legally supporting each side in a nonfrivolous dispute.  Nor do we find hopelessly irreconcilable the awkward requirement that the prime contractor both certify the claims of its subcontractors and provide the government with facts and theories with which to defend those claims.  In fact, this accords with the government's argument that the contractor is now required under the CDA "to disclose any facts which would undermine [its] claims." However, we believe that the resolution of the alternative arguments presented in a claim arising out of a government contract is properly made in accordance with the provisions of the CDA, and should not be the responsibility of the prime contractor as a prerequisite to certification of its subcontractor's claim.

*Id.* at 1559 (citation to legislative history omitted).  Although Turner's certification, unlike MK's October 22, 2010 certification in this case, contained all of the required elements for a CDA certification, the *Turner* decision provides several key insights into the certification of pass-through claims.

First, the CDA "certification requirement requires not that the prime contractor believe the subcontractor's claim to be certain, but that the prime contractor believe that there is good ground for the claim." *Turner*, 827 F.2d at 1561.  Second, the Federal Circuit requires that the sponsor of a pass-through claim make "a good faith effort to balance and comply with the competing concerns confronting it." *Id.* at 1559.  Third, it is not the role of the prime contractor to adjudicate the pass-through claim, but to certify and present the pass-through claim to the contracting officer if good ground for the claim exists. *Id.*  A few years later, the Federal Circuit had another opportunity to examine a

certification of a pass-through claim in *Transamerica Insurance Corp. ex rel. Stroup Sheet Metal Works v. United States*, 973 F.2d 1572 (Fed. Cir. 1992), *overruled in part on other grounds by Reflectone, Inc. v. Dalton*, 60 F.3d 1572 (Fed. Cir. 1995) (en banc).

The prime contractor in *Transamerica* was Bodenhamer Building Corporation (BBC).  BBC sponsored a claim for its subcontractor Stroup, providing a certification which complied with the language required by the CDA, but also attaching a cover letter containing qualifying statements:

> [T]his claim is being filed by our subcontractor and inasmuch as they do not have contract privity with you, we are acting as a conduit on their behalf in this matter. We do not have access to their books and records and, therefore, cannot make any statement with respect to the amount of their claim.  However, we have no reason to believe that their cost figures and delay estimates are incorrect.

*Transamerica*, 973 F.2d at 1580 (quotations removed).  The United States Claims Court deemed BBC's certification to be defective because of the qualifying language in the cover letter.  *Id.* at 1579.

The Federal Circuit disagreed.  Following *Turner*, the court stated that "the language of BBC's September 1, 1988 cover letter, which the Government alleges [impermissibly] qualified BBC's certification, is perfectly consistent with th[e] standard set out in *Turner*."  *Transamerica*, 973 F.2d at 1580.  The court specifically relied on the "good ground" language in *Turner* which describes the level of belief required for the sponsor of a pass-through claim, and also found that BBC's cover letter and enclosed certification were in substantial compliance with the CDA.  *Id.* at 1580-81.  *Transamerica* thus reinforces the "good ground" standard set forth in *Turner*, and also allows the prime contractor some leeway in qualifying its support for a pass-through claim, at least in some circumstances. *See, e.g.*, *George Hyman Constr. Co. v. United States*, 30 Fed. Cl. 170, 176 n.11 (1993) (citing *Transamerica*, 973 F.2d at 1580, for the proposition that a prime contractor "is permitted to qualify its certification of the claim under the CDA by relying on the subcontractor's representations"), *aff'd*, 39 F.3d 1197 (Fed. Cir. 1994).

Finally, the court turns to a contract appeals board decision, and the subsequent reversal of that decision by the Federal Circuit, which concerned a pass-through claim sponsored, at the insistence of a bankruptcy court, by a prime contractor. *Arnold M. Diamond, Inc.*, ASBCA No. 40885, 93-2 BCA ¶ 25,680, 1992 WL 398328 (Dec. 31, 1992) (*Diamond I*), *rev'd*, 25 F.3d 1006 (Fed. Cir. 1994) (*Diamond II*). The contracting agency was the United States Navy, the prime contractor was Arnold M. Diamond, Inc. (Diamond), and the subcontractor was Perth Amboy Iron Works, Inc. (PAI). The subcontractor's claim against the Navy was valued at approximately two million dollars, by PAI, although Diamond communicated to PAI that the prime contractor believed the claim was only worth $44,000 and warned PAI about procurement fraud:

> On 13 January 1987, [Diamond] sent to PAI its analysis of PAI's claim. Of the total claim of $1,902,570, [Diamond] concluded that PAI was entitled to recover approximately $44,000. In whole sections of PAI's claim document [Diamond] added the notation 'do not concur.' [Diamond] also advised PAI of the CDA certification requirements and forwarded to PAI educational treatises pertaining to the subject of procurement fraud investigations.

*Diamond I*, 1992 WL 398328.

Diamond submitted PAI's claim to the Navy two months later with no CDA certification from Diamond and this language in Diamond's cover letter:

> We are submitting this claim to you because we are obligated to honor the request of our Subcontractor, Perth Amboy Iron Works, Inc. This claim is submitted without comment, verification or mark up for [Diamond]
> . . . .

*Id.* The Navy rejected the pass-through claim because it was not certified by Diamond. PAI went into bankruptcy, whereupon Diamond attempted to convince the bankruptcy court that PAI's two million dollar claim was abandoned because it had not been properly certified (by PAI). Under orders from the bankruptcy court to issue a proper CDA certification, PAI issued "a properly worded" CDA

certification of its claim, and continued to assert the same amount for that claim.
Diamond demanded a response from PAI to Diamond's highly critical analysis of
PAI's claim for approximately two million dollars, and requested "documentation
which would justify and support the claim." *Id.* No documentation from PAI was
received by Diamond.

Diamond then renewed its request to the bankruptcy court that it find PAI's
two million dollar claim to have been abandoned. The bankruptcy court held a
hearing. The colloquy between the bankruptcy judge, Mr. Christopher M.
Houlihan (Diamond's counsel), and Mr. Samuel Z. Gdanski (Special Counsel
relied upon for his expertise in government contract law) is reproduced in relevant
part here:

> Mr. Houlihan: There's no problem with [PAI's]
> certification [language], your Honor. The problem is
> with the amount. When the claim was originally
> certified back in December of 1986 it contained a
> qualification. At that time Diamond asked PAI to certify
> the claim without qualification. A response came back
> in January of '87 saying we can't certify it exactly that
> way, to do so would be perjury. At that time in June, on
> June 13th of 1987 . . . Diamond did a very lengthy
> analysis of the PAI claim. It stated that the value of the
> claim was about $44,000, substantially less than the
> million nine. We've asked for a response to that and we
> have never received a response to that. In response to
> the Court's order of October 24th of 1988, PAI gave us a
> certification for the exact same amount of $1.9 million.
> Now, your Honor, as you're aware Diamond as the
> contractor is the one who has to certify the claim to the
> Navy.
> . . . .
> The Court: Are you suggesting to me that you have the
> authority and the right to decide what claim is going to
> be submitted by [PAI] to the Government?
> Mr. Houlihan: No, your Honor. I'm not suggesting that.
> What I am saying is that we face criminal and personal
> rather, civil penalties if we certify a claim which is false

and if we believe and we have put in writing that we believe a claim is worth $44,000 and we certify a million nine claim, I think it's going to raise some serious questions and put us in jeopardy.  [We'd] be happy to certify the million nine claim, your Honor, if we could get some back up on it. . . .

. . . .

The Court:  Well, what would you suggest I do, Mr. Gdanski?

Mr. Gdanski:  That you order –

The Court:  That I order [Diamond] to certify something that they don't feel in good faith they can certify?

Mr. Gdanski:  Yes.  They've got the caveat.  They've got the defense, the explanation.  It's on the record that they dispute the merits of the claim.  If they want to do that with a cover letter, they can do that.  Or in the absence, your Honor, of your office ruling substantively on the issue we could elevate this to the Armed Services Board of Contract Appeals and let them rule on this.

. . . .

Mr. Houlihan:  . . . If the Court ordered Diamond to certify the claim, Diamond would do it and we could go to the Navy and say that we have been ordered by the United States Bankruptcy Court to certify this claim for a million nine and we would do that.

The Court:  You think I have a right to order you to certify something that you don't feel that you can do in good faith?

Mr. Houlihan:  Well, your Honor, it is an asset of the bankrupt's estate and it would be in the interest of the creditors to pursue this claim, if it is a valid claim and we would have the security of a court order.  We have brought to the Court's attention our difficulties with the claim and if your Honor decided that we should proceed, we would follow your order immediately.

The Court:  It is so ordered.  The motion for an order declaring the claim abandoned is denied and Arnold M. Diamond, Inc. is hereby ordered to submit the -- to

18

> certify the claim of PAI, together with Diamond's other
> claim or claims and submit same to the Government for
> review.  I'm satisfied that on a basis of the review of the
> statute and the pleadings it appears to me that there is a
> basis, a good faith basis for certifying the claim and I'm
> going to order and direct Diamond to do so.

*Diamond I*, 1992 WL 398328.  Diamond then complied with the court's order and certified PAI's claim for approximately two million dollars, and included the prime contractor's mark-up on that claim.  *Id.*  Diamond did not mention within its certification that its CDA certification of the pass-through claim was submitted in compliance with the order of the bankruptcy court.

The Navy denied the pass-through claim in its entirety, and Diamond sought review of that decision before the Armed Services Board of Contract Appeals (ASBCA or board).  The board acknowledged that Diamond's certification of the pass-through claim "contain[ed] the language required by the CDA."  *Diamond I*, 1992 WL 398328.  The board cited *Turner*, but noted that, unlike the circumstances of *Turner*, "[i]n this appeal[] we confront the unique, undisputed factual situation in which the prime contractor has itself attacked the claim it later certified, and certified the claim only after receiving a court order to do so."  *Diamond I*, 1992 WL 398328.

In the face of strong evidence that Diamond did not believe in the validity of PAI's two million dollar claim, the ASBCA held that Diamond's certification was not valid.  The board stated that:

> Honesty with a subcontractor or the baring of one's soul
> to the Bankruptcy Court is not the good faith envisioned
> by the CDA certification requirement.  The claim must
> be submitted to the Government in good faith.  There is
> more than ample evidence that was not done in this case.

*Diamond I*, 1992 WL 398328.  The ASBCA also commented that the board was "unprepared to attach unwarranted importance to a [bankruptcy] court order which is violative of a statute [(the CDA)] over which we have province."  *Id.*  After Diamond's motion for reconsideration was denied, Diamond appealed the board's decision to the Federal Circuit.

The Federal Circuit largely adopted the board's factual findings, but noted that Diamond's CDA certification of PAI's claim had been accompanied by a letter notifying the Navy of the bankruptcy court's order, and that a copy of the court order was attached to that letter. *Diamond II*, 25 F.3d at 1009. The court then proceeded to rule upon Diamond's CDA certification. The court's thorough discussion of pass-through claims, bankruptcy court orders and the effect of such orders on CDA certification is instructive. The Federal Circuit first noted that Diamond met its obligations as a prime contractor under the CDA:

> The Board's findings of fact demonstrate that Diamond complied fully with the congressional mandate to review and manage the claim of its subcontractor. Ironically, however, the data that Diamond developed in its analysis of PAI's claim, as well as Diamond's representations to the Bankruptcy Court, were used by the Government in persuading the Board to dismiss Diamond's appeal. The Board concluded that Diamond did not consider that there was good ground for the claim it had submitted [o]n behalf of its subcontractor and consequently, that the claim was not submitted in good faith.

*Id.* (footnoted omitted).

The Federal Circuit then discussed bankruptcy proceedings and the authority of bankruptcy courts, and concluded that a bankruptcy court's orders are entitled to significant deference in government contract disputes when the prime contractor and subcontractor are within the bankruptcy court's jurisdiction. *Diamond II*, 25 F.3d at 1010. The court then applied that deference to the issue of the "good faith" of the sponsor of a pass-through claim, noting, first, that the "term 'good faith' is not defined in the CDA." *Id.* The Federal Circuit borrowed a definition of good faith from an en banc decision of the Supreme Court of California:

> The phrase "good faith" in common usage has a well-defined and generally understood meaning, being ordinarily used to describe that state of mind denoting honesty of purpose, freedom from intention to defraud, and, generally speaking, means being faithful to one's

duty or obligation.

*Id.* (quoting *People v. Nunn*, 46 Cal. 2d 460, 468, 296 P.2d 813, 818 (1956) (en banc)).

Applying deference and this definition of good faith, the Federal Circuit approved of Diamond's CDA certification:

> It is clear from the record in this case that Diamond had no intention either to defraud or deceive the Navy.  To the contrary, the Board's findings of fact show that in its direct dealing with PAI and in the Bankruptcy Court, Diamond took every measure that could reasonably have been expected of a prime contractor, under the circumstances, to obtain PAI's support and justification for its claim in an amount which Diamond felt it could conscientiously certify.  Alternatively, Diamond petitioned the Bankruptcy Court to relieve Diamond of its obligation to certify PAI's claim.  Instead of obtaining the relief it sought, Diamond was ordered to certify the claim by the Bankruptcy Court.  Diamond complied with the order and notified the contracting officer that it had certified the claim because it was required to do so by order of the Bankruptcy Court.  When one contrasts the Board's conclusion of law with its findings of fact, the question that arises is:  "What other course could a reasonable contractor have taken in the circumstances to show that it acted in good faith?"  Significantly, the Board in its opinion stated:  "We agree that appellant's actions, for the most part, demonstrate a conscientious effort to meet its ethical, contractual, and statutory obligations."  Nevertheless, the Board held that Diamond had not acted in good faith.

> This court agrees with Diamond's contention that it acted in the reasonable belief that there was no viable alternative to the course of action it followed in this case.  First, Diamond's efforts to file its own properly certified

>claim came to naught.  Second, Diamond was obligated
>both by . . . the CDA and the Order of the Bankruptcy
>Court to certify the subcontractor's claim.  If it had
>refused to do so, Diamond would have exposed itself to a
>suit for damages by PAI without any right of
>reimbursement.  Third, there was a possibility that if it
>had disobeyed the order of the Bankruptcy Court,
>Diamond would have been cited by that court for civil
>contempt.

*Diamond II*, 25 F.3d at 1010-11 (footnote omitted).  Finding good faith in Diamond's CDA certification, the court reversed the ASBCA and remanded for further proceedings.

It is important to note that the *Diamond II* decision distinguished *Turner*, not because the "good ground" standard of belief in the validity of a subcontractor's claim is too low for the factual scenario of *Diamond II*, but because "good ground" may actually be *too high* a standard of belief for a court-ordered CDA certification:

>We recognize that in [*Turner*], this court held that while
>the certification provision does not require the prime
>contractor to believe that the subcontractor is entitled to
>recover on the claim, it is necessary that the prime
>believe that there is good ground for the subcontractor's
>claim.  However, that case is factually distinguishable,
>because in *Turner*, unlike the situation in this case, the
>prime contractor was not required by a court of
>competent jurisdiction to certify the subcontractor's
>claim in spite of the prime's belief that there was not
>good ground for most of the amount claimed by the
>subcontractor.

*Diamond II*, 25 F.3d at 1009 n.2.  Thus, *Diamond II* considers the CDA certification of a pass-through claim which results from a bankruptcy court order to be a special type of CDA certification, and one which may, in certain circumstances, be held to less-stringent standards than those set forth in *Turner*

22

and *Transamerica*, for example.  Compliance with a bankruptcy court order appears to be enough to satisfy the good faith requirement, in the circumstances of *Diamond II*, which are very similar to the circumstances of MK's October 22, 2010 certification of GIT's claim.

### 5.    MK's October 22, 2010 Certification Constitutes a Defective Certification, Not a Failure to Certify

Having considered *Diamond II*, the precedential case most on point, and the holdings of *Turner* and *Transamerica*, the court notes first that in each of these three cases, the prime contractor provided a certification with language containing the elements required by the CDA, along with the pass-through claim.  Here, MK's conforming certification was not delivered to the contracting officer until December 22, 2015, after plaintiffs' amended complaint was filed in this court.  In addition, none of these precedential decisions applied the 1992 amendment to the CDA to the cases before them.  Acknowledging these distinctions, the court does not believe the holdings of these precedential cases can be extended to find that MK's October 22, 2010 certification, by itself, was a valid certification under the CDA.

Nevertheless, the court does consider these three precedential cases to controvert the "failure to certify" challenge raised by defendant.  Defendant argues that MK's October 22, 2010 certification is fatally undermined by MK's representations to the bankruptcy court that MK had legitimate concerns as to the amount claimed by GIT.  Def.'s Reply at 7.  The holding in *Diamond II*, however, shows that compliance with a bankruptcy court's order can be sufficient to show that, despite expressed reservations, the prime contractor's sponsorship is made in good faith.  The holding in *Turner* shows that certainty as to a subcontractor's claim is not required, just a belief that the claim has "good ground."  The *Transamerica* holding permits the prime contractor to express qualified support for a pass-through claim.  In light of these authorities, the court cannot conclude that MK's October 22, 2010 certification was a complete failure to certify GIT's claim.  Instead, under *Diamond II*, *Turner* and *Transamerica*, it was a defective certification, and that defective certification was cured on December 22, 2015.  This court is not deprived of jurisdiction, nor does plaintiffs' amended complaint fail to state a claim upon which relief may be granted because of the manner of MK's certification of GIT's claim.

**B.     MK Remains Liable to GIT as a Result of the MK Bankruptcy Litigation**

The court turns now to the government's argument which relies on the *Severin* doctrine, a doctrine named for a 1943 opinion issued by the Court of Claims.  According to this doctrine, a prime contractor may not sponsor a pass-through claim unless it remains liable to its subcontractor on the underlying claim.  *See Severin*, 99 Ct. Cl. at 443 ("If [the prime contractor] plaintiffs had proved that they, in the performance of their contract with the Government became liable to their subcontractor for the damages which the latter suffered, that liability, though not yet satisfied by payment, might well constitute actual damages to plaintiffs, and sustain their suit.").  In this case, defendant argues that because "MK obtained a discharge of its liability to GIT in bankruptcy, . . . MK is not liable to GIT or the secured parties for the claims asserted in this litigation [and MK] cannot sponsor the secured parties' claims under the *Severin* doctrine."  Def.'s Mot. at 25-26.

The *Severin* doctrine has evolved since 1943.  *See, e.g.*, *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1552 n.8 (Fed. Cir. 1983) ("In subsequent cases, the application of the *Severin* doctrine has been narrowly construed.") (citation omitted); *Seger v. United States*, 469 F.2d 292, 300 (Ct. Cl. 1972) ("It is time to put the *Severin* rule to rest insofar as subcontractor claims are asserted as an equitable adjustment under the provisions of a prime contract with the Government.") (footnote omitted).  Among the limitations on the modern *Severin* doctrine are two that are applicable in this case:  (1) the burden is on the government to prove that the prime contractor is no longer liable to its subcontractor on the pass-through claim; and (2) the *Severin* doctrine generally requires an "'an iron-bound release or contract provision immunizing the prime contractor completely from any liability to the sub.'"  *E.R. Mitchell Constr. Co. v. Danzig*, 175 F.3d 1369, 1370-71 (Fed. Cir. 1999) (citations omitted).

The parties have not cited to any cases providing precedent binding on this court which analyze the liability of a bankrupt prime to its subcontractors for purposes of applying the modern *Severin* doctrine to pass-through claims.  Both parties rely on *J. L. Simmons Co. v. United States*, 304 F.2d 886 (Ct. Cl. 1962), as providing some guidance.  The court agrees that *J. L. Simmons* is helpful because it shows that anything less effective than an "iron-bound release or contract provision" is insufficient for the *Severin* doctrine to block a pass-through suit. The analysis in *J. L. Simmons* also provides an analytical framework which, in the

24

court's view, compels a rejection of the government's *Severin* doctrine challenge to the amended complaint in this case.

The subcontracts between J. L. Simmons and its subcontractors contained "releases" which permitted two means for resolving the subcontractors' claims against the prime contractor. *J. L. Simmons*, 304 F.2d at 888. If the prime's pass-through suit was successful, the prime would pay out the proceeds to its subcontractors. *Id.* If, however, the pass-through suit failed, the prime's liability was extinguished. *Id.* The court described this arrangement as falling into a middle ground between liability and no liability: "Lying between these extremes are those cases involving situations wherein the prime contractor has agreed to reimburse its subcontractor for damages it has suffered at the hands of the Government, but only as and when the former receives payment for them from the Government." *Id.* at 889. The court noted that this middle ground of liability was enough to escape dismissal of a pass-through claim under the *Severin* doctrine. *Id.* (citing cases). Ruling for J. L. Simmons, the court provided an analytical framework for deciding when a prime contractor retains at least an "implicit" liability to its subcontractors:

> In our view, defendant . . . misconceives the over-all tenor of the releases. Although the language used may be somewhat inartistic, we think that, taken as a whole, the releases do recognize an existing liability on the part of plaintiff for these claims. We have indicated that plaintiff's liability is not expressly negated in any event. Rather, the releases simply purport to set forth the manner in which plaintiff's liability is to be extinguished. Certainly implicit, at least, in these provisions would seem to be a recognition on the part of the parties that plaintiff is liable for these claims. Otherwise, there would be no reason for the parties to go to the trouble of providing a method for extinguishing a nonexisting liability. Consequently, we have here a situation where plaintiff's liability for these claims was recognized and expressly preserved at the time the releases were entered into.

Moreover, it is apparent that, insofar as they relate to

these particular claims, the releases are clearly
conditional or contingent in nature.  They become
operable only if and when plaintiff prosecutes these very
claims against the Government to a final judgment.
Even then, if the claims are found meritorious, plaintiff's
liability is not extinguished until actual payment is made
to the subcontractors.  Thus, the releases neither
exonerate plaintiff from liability *ab initio* nor
subsequently, but do impose certain obligations on
plaintiff which it must fulfill before its duty to reimburse
these subcontractors for the damage allegedly caused by
the Government is extinguished.  It is apparent, then, that
plaintiff is presently subject to liability on these claims
and will continue to be so until liability is extinguished
in accord with the method agreed to by the parties.

*Id.* at 890.

The court must follow *J. L. Simmons*, and finds a strong parallelism between
the implicit liability described in that case and the implicit liability of MK in the
MK bankruptcy litigation.  Instead of releases written into its subcontracts, MK's
liability is established by the bankruptcy court's jurisdiction over MK and that
court's order requiring MK to submit a CDA certification.  Even though post-
bankruptcy MK, just like J.L. Simmons, may not be required to pay anything to
satisfy its subcontractor's claim, MK still has "certain obligations . . . which it
must fulfill before its duty to reimburse [its] subcontractor[] . . . is extinguished."
*J.L. Simmons*, 304 F.2d at 890.  As was the case for J.L. Simmons, if MK prevails
in this suit, the proceeds must be paid by post-bankruptcy MK to the owners of
GIT's claim.[6]  Under this authority, the court finds that defendant failed to meet its
burden to prove that MK is not liable to GIT and that the *Severin* doctrine bars
MK's pass-through claim.

The parties also dispute whether this case should be distinguished from or

_____

[6]/ MK is only a nominal plaintiff for the benefit of the assignees of GIT's claim.  *See*
Def.'s App. at 71 (noting that defendant's counsel wishes to ensure that MK is correctly
identified by its current corporate name so that it can receive any monetary judgment issued in
this case).

governed by the analysis set forth in *Brazier Forest Products, Inc. v. United States*, 11 Cl. Ct. 468 (1987). The court relies on *Brazier* for the limited purpose of establishing that a bankrupt prime may, in certain circumstances, sponsor a pass-through claim despite the *Severin* doctrine. For the same limited purpose, the court notes that a bankrupt prime contractor was nonetheless able to sponsor a pass-through claim in *International Technology Corp.*, ASBCA No. 54136, 04-1 BCA ¶ 32,607 (Apr. 27, 2004). That pass-through claim eventually failed on the merits, but it did not fall prey to the *Severin* doctrine. *See id.* n.1; *see also Int'l Tech. Corp. v. Winter*, 523 F.3d 1341, 1344 n.1 (Fed. Cir. 2008). The court must reject defendant's *Severin* doctrine challenge to the amended complaint because the government has not met its burden to prove that the modern *Severin* doctrine bars MK's pass-through claim.

### C.   GIT's Claim is Plausibly an Allowable Cost under the DOE Contract

Having confirmed its jurisdiction over this suit, and having rejected defendant's arguments regarding the certification of MK's pass-through claim and MK's liability for that claim, the court turns to the government's RCFC 12(b)(6) argument disputing the "allowability" of the cost of the pass-through claim under MK's contract with DOE. The government contends that "the claimed costs [in GIT's claim] are not allocable or allowable under the contract between MK and DOE because MK never incurred the costs, and has no liability for the costs." Def.'s Mot. at 2; *see also* Def.'s Reply at 12 (arguing that any lingering liability from MK's bankruptcy "does not establish that MK has incurred or will incur the cost of [GIT's] claim"). This argument relies on two authorities, a FAR provision alleged in the amended complaint to be part of MK's contract with DOE, and an inapposite citation from a decision of the Civilian Board of Contract Appeals adjudicating DOE's reimbursement liability for another aspect of the litigation between MK and GIT. Neither of these authorities convinces the court that MK's pass-through claim is not plausible.

The FAR provision cited by defendant is FAR 31.201-1, 48 C.F.R. § 31.201-1 (1984).[7] In relevant part, it states:

---

[7]/ Defendant cites to the "1983" version of the FAR for the language quoted here. Def.'s Mot. at 27. To the extent that there was a 1983 version of the FAR, it did not take effect until

(continued...)

> The total cost of a contract is the sum of the allowable
> direct and indirect costs allocable to the contract,
> incurred or to be incurred . . . .

*Id.* The government focuses on the "incurred or to be incurred" language of the regulation, and again argues, just as it did in its *Severin* doctrine argument, that MK has not incurred and will never incur the costs of the pass-through claim because of its discharge of GIT's claim in the MK bankruptcy litigation. For this reason, the government argues that "MK's liability for the GIT judgment . . . [cannot] be charged to the [DOE] contract as an allowable cost." Def.'s Mot. at 29.

The government fails to cite a single case which interprets the scope and meaning of FAR 31.201-1, in general, or which interprets this regulation specifically in terms of a bankruptcy discharge. The court thus has nothing more than the government's *ipse dixit* assertion that an unsatisfied judgment that is part of a prime contractor's bankruptcy estate cannot be allowable to a cost reimbursement contract under FAR 31.201-1.[8] Under the standard of review required by RCFC 12(b)(6), and in the face of such a lack of persuasive authority, the court cannot conclude that MK's pass-through claim is not at least plausibly allowable under MK's contract with DOE.

The government fares no better with its reliance on *URS Energy & Construction, Inc.*, CBCA No. 2260,12-2 BCA ¶ 35,094 (June 29, 2012). The decision in *URS Energy* focused on a liability of MK that was *not* discharged in the MK bankruptcy litigation, *i.e.*, MK's liability to its surety "Federal":

---

[7](...continued)
April 1, 1984. *See* Establishing the Federal Acquisition Regulation, 48 Fed. Reg. 42,102, 42,102 (Sept. 19, 1983). The contract between MK and DOE was entered into in 1983. Am. Compl. ¶ 7. The text of FAR 31.201-1 is available in the 1984 edition of the Code of Federal Regulations.

[8]/ The contract provisions governing allowable costs actually set forth in MK's contract with DOE are not before the court. Although the government may be correct that MK's contract included essentially the same language as FAR 31.201-1, as alleged in plaintiffs' amended complaint, the foundation for defendant's "allowable costs" argument is far from solid. *See supra* note 7.

> In this appeal, [MK] seeks reimbursement only for the
> amount it was obligated to pay Federal, as surety, as part
> of its indemnity obligation.  Because [MK]'s
> indemnification obligation was not discharged during the
> bankruptcy, the bankruptcy does not, in any way, affect
> the outcome of the case.

*Id.*  The board of contract appeals in *URS Energy* nowhere discusses the
allowability of a claim that *was* discharged in bankruptcy, under FAR 31.201-1 or
any other regulation.  Simply put, the board did not discuss or make any findings
as to the effect of a bankruptcy discharge on the allowability of contract costs.
The government's contention that MK's pass-through claim is not plausible under
FAR 31.201-1 and *URS Energy* is not persuasive.

### D.     Remand for a Contracting Officer's Decision on the Merits of MK's Pass-Through Claim

The court raises an issue *sua sponte* regarding further proceedings in this
case.  Normally, having dismissed all of the government's challenges to a
complaint, the court would require an answer to the complaint.  Here, however, the
DOE contracting officer never reached the merits of MK's pass-through claim due
to a defective certification that was only corrected very recently.  In somewhat
analogous circumstances, this court remanded a CDA claim to a federal agency for
a decision on the merits of that claim:

> Once the court determines that a case is within its
> jurisdiction, it has juridical power to enter an order
> remanding the case to another body, either at the request
> of a party or on its own motion.  The Tucker Act grants
> this court "the power to remand appropriate matters to
> any administrative or executive body or official with
> such direction as it may deem proper and just."  28
> U.S.C. § 1491(a)(2).  When the factual record before the
> court is incomplete or additional agency proceedings or
> action are necessary, a remand may be appropriate.  Both
> deficiencies exist here.  [The agency] did not act on a
> number of Rollock's claims, and, when it did act, it left
> salient matters unresolved.  [The agency] should further

> develop the factual record and definitively act on
> Rollock's claims.

*Rollock Co. v. United States*, 115 Fed. Cl. 317, 334 (2014) (citations omitted).

In another recent case, a contracting officer delayed the issuance of his final decision on a CDA claim too long and the contractor brought suit in this court under a "deemed denial" theory. *Rudolph & Sletten, Inc. v. United States*, 120 Fed. Cl. 137 (2015). This court found that it had jurisdiction over the cause, but remanded the claim to the contracting officer for a final decision on the merits. *Id.* at 143. The court cited 41 U.S.C. § 7103(f)(5) for its authority to do so. Under the same statutory authority the boards of contract appeals also will stay proceedings, in some circumstances, to allow a contracting officer's decision to issue on the merits of a CDA claim. *See, e.g.*, *Brad West & Assocs., Inc.*, CBCA No. 3879, 14-1 BCA ¶ 35,744 (Sept. 18, 2014) (noting in the procedural history of that case that the board had "directed [the agency] to issue a [contracting officer's] decision within thirty days, or advise the Board as to why such a decision could not be issued"); *Lobar, Inc.*, ASBCA No. 59178, 14-1 BCA ¶ 35,584 (Apr. 18, 2014) ("We conclude that the issuance of a CO's decision will better enable the parties to potentially settle this appeal and therefore grant the motion to stay proceedings until 12 May 2014 to issue a CO's decision.").

The court believes that there is ample reason for a remand to DOE in this case. First, the defective certification has been cured, thus removing the reason the contracting officer gave for refusing to consider MK's pass-through claim. Am. Compl. ¶ 24. Second, the factual underpinnings of the pass-through claim are interwoven with proceedings before a number of federal courts and the Civilian Board for Contract Appeals. These complex facts need to be analyzed in the context of the DOE project and contract documents. The DOE contracting officer is best situated to undertake this review in the first instance. Third, the type of underlying claim presented here is rather unusual, in that it is founded on a partially-satisfied judgment issued by a district court. DOE must render a decision on this unusual claim in light of its own interpretation of relevant law and relevant contract provisions.

For all of the above reasons, the court will remand MK's pass-through claim to DOE. In order for this process to function smoothly, the court solicits the parties' input into an appropriate remand order. The instructions to DOE cannot

dictate any particular outcome, as such an order would exceed this court's remand authority. *See, e.g.*, *Todd Constr., L.P. v. United States*, 88 Fed. Cl. 235, 245 (2009) ("The common theme running through these [remand] cases is that the remand does not mandate a particular factual determination, but directs the agency's attention to matters the court believes require further action to create an adequate record for the agency's decision."). However, the parties may be able to suggest the appropriate period of time for such a remand and other requirements that would help this litigation proceed more efficiently from this point forward. Once the court has received a jointly-drafted proposed remand order from the parties, the court will remand MK's pass-through claim to DOE's contracting officer for the issuance of a final decision on that claim.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss is denied. The court agrees with defendant, however, that the caption of this case should be modified to reflect the correct corporate name of the current prime contractor with DOE, URS Energy & Construction, Inc., the successor to MK and the sponsor of the claim set forth in the amended complaint. *See* Def.'s Mot. at 3. The parties should substitute "URS Energy & Construction, Inc." for "M.K. Ferguson Company" in the caption of this case from this point going forward. The next procedural step in this case will be to remand plaintiffs' claim to DOE. The court stays all other proceedings in this case until further order of the court.

Accordingly, it is hereby **ORDERED** that

(1)   Defendant's Motion to Dismiss the First Amended Complaint, filed November 16, 2015, is **DENIED**;

(2)   The Clerk's Office is directed to **CORRECT** the docket to show the following four named plaintiffs and **ALL FUTURE FILINGS** by the parties shall reflect this change:  URS ENERGY & CONSTRUCTION, INC., for the use and benefit of the secured creditors of GROUND IMPROVEMENT TECHNIQUES, INC.; PNC BANK, N.A.; FIREMAN'S FUND INSURANCE COMPANY; and, R.N. ROBINSON & SONS, INC.;

(3)    The Clerk's Office is directed to **SUSPEND** all proceedings in this case until further order of the court; and,

(4)    Defendant shall **FILE** a **Notice** containing the parties' proposed remand order to DOE on or before **May 6, 2016**.

/s/Lynn J. Bush_____
LYNN J. BUSH
Senior Judge